U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

AUG 2 0 2002

ROBERT H. SHEMWELL, CLERK
BY _____
                    DEPUTY

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

| | |
|---|---|
| RICHARD H. YOUNG and MELVIE GOLDSBY | CIVIL ACTION NO. 02-1644 |
| VERSUS | JUDGE ROBERT G. JAMES |
| OUACHITA PARISH SCHOOL BOARD, ET AL. | MAG. JUDGE JAMES D. KIRK |

## RULING

This is an action by Richard H. Young and Melvie Goldsby ("Plaintiffs") for declaratory and injunctive relief against the Ouachita Parish School Board ("the School Board"), Dr. Bob Webber ("Webber"), Jack White ("White"), Scott Robinson ("Robinson"), A.R. Sims ("Sims"), Jerry R. Hicks ("Hicks"), John Russell ("Russell"), Carey Walker ("Walker"), and Greg Manley ("Manley") (collectively referred to as "Defendants").

Plaintiffs allege that the redistricting plan adopted by the School Board on January 17, 2002, results in a denial or abridgement of the right of African-American citizens of Ouachita Parish to vote on account of race.

Plaintiffs pray for (1) a declaratory judgment finding that the School Board's redistricting plan violates the Fourteenth and Fifteenth Amendments to the Constitution of the United States and § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 ("the Voting Rights Act"); (2) a permanent injunction barring the School Board from using the plan; (3) a Court order placing into effect a new plan for electing School Board members; and (4) a Court order enjoining the qualifying period, which begins on August 21, 2002, and enjoining the primary election, which takes place on October 5, 2002.

A hearing on Plaintiffs' request for preliminary injunctive relief was held before this Court on August 19, 2002. Notice was received, and all parties were represented by counsel. Having considered the evidence introduced at the hearing and the argument of counsel, Plaintiffs' request for preliminary injunctive relief is GRANTED.

## *I. FINDINGS OF FACT*

The Court finds the following facts to be established:

Plaintiffs are African-American citizens of Ouachita Parish who are registered to vote.

Historically, white candidates in Ouachita Parish receive approximately 90% of the white vote, while African-American candidates receive approximately 90% of the African-American vote.

The 1990 Census reflects that the total population of Ouachita Parish, excluding the City of Monroe,[1] was 87,282. Under the 2000 Census, the total population of Ouachita Parish, excluding the City of Monroe, was 94,143. The 2000 population is 80.10% (75,412) white and 18.13% (17,064) African-American. Approximately 33.89% (2,325) of the population increase was white, and approximately 50.60% (3,472) of the population increase was African-American.

The School Board consists of seven single-member districts, one of which is a majority-minority district. Since 1980, two African-Americans have been elected to represent this majority-minority district, one of whom, Russell, is currently serving on the School Board.

The School Board retained David Creed ("Creed"), Executive Director of the North Delta

---

[1] The Louisiana Constitution authorizes the community of Zachary and City of Baker in East Baton Rough Parish, the City of Bogalusa in Washington Parish, and the City of Monroe in Ouachita Parish to establish municipal school systems. La. Const. Art. VIII, § 13. Therefore, the population of the City of Monroe is excluded from the Court's analysis.

Regional Planning and Development Commission, to determine whether the population growth in Ouachita Parish necessitated redistricting. Creed determined that redistricting was necessary because of significant deviations in several districts. After receiving input from various School Board members, Creed prepared eighteen redistricting plans. Some of the plans maintained seven districts and others provided for eight districts. Creed did not take race into account when creating these redistricting plans, except for the purpose of maintaining the integrity of the majority-minority district. Creed did not prepare any redistricting plans which provided for a second majority-minority district.

One of Creed's plans, Plan No. 2(8), provided for eight single-member districts, one of which was a majority-minority district with a 68.41% (8,009) African-American majority. Plan No. 2(8) had a total deviation of 7.04%, with the largest positive deviation being 3.02% and the largest negative deviation being -4.02%.

Another of Creed's plans, Plan No. 13, maintained seven single-member districts, one of which was a majority-minority district with a 69.62% (9,411) African-American majority. Plan No. 13 had a total deviation of 9.57%, with the largest positive deviation being 4.72% and the largest negative deviation being -4.85%.

On January 17, 2002, the School Board met in special session and voted four to three to adopt Plan No. 2(8). The vote was split along geographic lines with the four West Ouachita members voting for the plan and the three East Ouachita members voting against the plan. Russell offered a substitute motion that the School Board approve Plan No. 13. Russell's substitute motion failed by an identical vote.

On February 5, 2002, the School Board held a hearing for the purpose of presenting Plan

No. 2(8) to the public before its submission to the United States Department of Justice for pre-clearance pursuant to §5 of the Voting Rights Act. At the hearing, several members of the public expressed opinions either supporting or opposing Plan No. 2(8).

On March 12, 2002, the School Board submitted Plan No. 2(8) to the United States Department of Justice. On May 13, 2002, the United States Department of Justice pre-cleared Plan No. 2(8).

On August 2, 2002, Plaintiffs filed suit against Defendants seeking declaratory and injunctive relief.

This Court held a hearing on Plaintiffs' request for a preliminary injunction on August 19, 2002. At the hearing, Plaintiffs' demographic expert Glenn Koepp ("Koepp") presented a redistricting plan consisting of eight single-member districts with two majority-minority districts. Under Koepp's plan, District D had a total African-American population of 56.12% and a total African-American voting age population of 51.84%. District G had a total African-American population of 60.29% and a total African-American voting age population of 53.95%. Koepp's plan had a total deviation of 8.72%, with the largest positive deviation being 4.01% and the largest negative deviation being -4.71%.

## II. CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

In determining whether to grant or deny a preliminary injunction, the Court applies a four-part test:

> (1) a substantial likelihood that plaintiff will prevail on the merits;

(2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted;

(3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to the defendant; and

(4) that granting the preliminary injunction will not disserve the public interest.

*Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). "A preliminary injunction is an extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors." *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989) (citing *Mississippi Power & Light v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985); *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 389 (5th Cir. 1984)). Failure of the movant to establish any one of the four factors defeats the right to injunction. *See Rohoe, Inc. v. Marque*, 902 F.2d 356 (5th Cir. 1990). As discussed below, the Court concludes that Plaintiffs have sufficiently established all four factors and, therefore, are entitled to injunctive relief.

**A.  Plaintiffs have Proven a Substantial Likelihood that They Will Prevail on the Merits**

Section 2 of the Voting Rights Act provides in part, "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 42 U.S.C. § 1973(a). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

The plaintiffs must satisfy three preconditions to establish a § 2 violation: The plaintiffs must demonstrate that (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *Gingles*, 478 U.S. at 50-51.[2] While the preconditions are necessary, they are not sufficient to prove voter dilution. *Clark v. Calhoun County*, 88 F.3d 1393, 1395 (5th Cir. 1996) ("*Clark II*") (citing *Johnson v. DeGrandy*, 512 U.S. 997, 1011-12 (1994)). If the preconditions are proven, the plaintiffs must show that "under the 'totality of the circumstances' they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." *Id.* (quoting *League of United Latin American Citizens v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993)). However, "[i]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances." *Clark II*, 88 F.3d at 1396 (quoting *Jenkins v. Red Clay Consolidated School District Board of Education*, 4 F.3d 1103, 1135 (3d Cir. 1993)).

1.  **Plaintiffs Have Proven that the Minority Group is Sufficiently Large and Geographically Compact to Constitute a Majority in Two Single-Member Districts**

In order to satisfy the size element of the first *Gingles* factor, vote dilution claimants are required to prove that their minority group exceeds 50% of the citizen voting-age population in the demonstration district. *Valdespino v. Alamo Heights Independent School District*, 168 F.3d

---

[2]Although *Gingles* involved a plan with multi-member districts, the Supreme Court has held that the *Gingles* framework applies to both single-member and multi-member districting schemes. *See Growe v. Emison*, 507 U.S. 25, 39-41 (1993).

848, 852-53 (5th Cir. 1999). With reference to compactness, "[t]he first *Gingles* precondition does not require some aesthetic ideal of compactness, but simply that the black population be sufficiently compact to constitute a majority in a single-member district. Moreover, plaintiffs' proposed district is not cast in stone." *Clark v. Calhoun County*, 21 F.3d 92, 95 (1994) ("*Clark I*").

The first majority-minority district in Koepp's plan had a total African-American voting age population of 51.84%, and the second majority-minority district in Koepp's plan had a total African-American voting age population of 53.95%. Further, the Court finds that the majority-minority districts in Koepp's plan are reasonably compact considering that "it was simply presented to demonstrate that a majority-black district is feasible . . . ." *Clark I*, 21 F.3d at 95. Accordingly, the Court concludes that Plaintiffs have made a satisfactory showing that the minority population in Ouachita Parish is sufficiently large and geographically compact to constitute a majority in two single-member districts.

    **2.**     **Plaintiffs Have Proven that the Minority Group is Politically Cohesive and that the White Majority Votes Sufficiently as a Bloc to Enable it to Defeat the Minority's Preferred Candidate**

The final two *Gingles* factors are usually established through evidence of racially polarized voting. *Clark I*, 21 F.3d at 96 (citing *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1207 (5th Cir. 1989)). At the hearing, Plaintiffs offered testimony from Koepp and James E. Mayo ("Mayo"), the mayor of the City of Monroe. Koepp and Mayo averred that in homogeneous voting precincts, cross-over voting was less than 10%. This testimony was supported by election results from the 1995 gubernatorial election involving Cleo Fields and M.J. "Mike" Foster, the 1999 gubernatorial election involving William Jefferson and

M.J. "Mike" Foster, and the 1999 mayoral election for the City of Monroe involving Melvin Rambin and Abe Pierce.[3] This evidence is uncontested and, the Court concludes, sufficient to establish that voting in Ouachita Parish is racially polarized. *See also Ausberry v. City of Monroe*, 456 F. Supp. 460, 464 (W.D. La. 1978).

Having found that Plaintiffs have satisfied the three *Gingles* factors, and in light of the fact that it is "only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances," the Court concludes that Plaintiffs have proven a substantial likelihood that they will prevail on the merits. *Clark II*, 88 F.3d at 1396 (quoting *Jenkins,* 4 F.3d at 1135).

**B.     Plaintiffs have Proven the Remaining Injunction Factors**

Having found a substantial likelihood that Plaintiffs will succeed at trial, the Court concludes that the threatened harm to Plaintiffs outweighs the harm that Defendants might sustain and that enjoining the election will not disserve the public interest.

The threatened harm to Plaintiffs is that they will effectively be deprived of their right to vote. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). The harm that the injunction could cause Defendants is less severe. Ultimately, the injunction will only delay the election, not preclude it, and the Court expects that

---

[3] Although the City of Monroe is excluded from the Court's population analysis, the voting patterns of the citizens of the City are relevant to the voting patterns of the citizens of Ouachita Parish.

8

this matter will be dealt with expeditiously. Further, if the election were not enjoined and Plaintiffs subsequently succeeded at trial, the Court would have to upset the election results, implement a new plan, and order that a second election be conducted. This would negate considerable expenditures of time and money by the citizens of Ouachita Parish elected under the invalid plan and would negate votes cast by electors of the School Board.

"It cannot be gainsaid that federal courts have the power to enjoin state elections." *Chisolm v. Roemer*, 853 F.2d 1186, 1190 (5th Cir. 1988) (citing *Watson v. Commissioner's Court of Harrison County*, 616 F.2d 105 (5th Cir. 1980); *Hamer v. Campbell*, 358 F.2d 215 (5th Cir. 1966)). The Court is mindful that "'intervention by the federal courts in state elections has always been a serious business' not to be lightly engaged in." *Chisolm v. Roemer*, 853 F.2d 1186, 1190 (5th Cir. 1988) (quoting *Oden v. Brittain*, 396 U.S. 1210 (1969) (Black, J., opinion in chambers)). Under the circumstances in this case, the Court concludes that the balance of the harms favors enjoining the election. The Court chooses to delay the election at the present stage in light of the substantial possibility that if the election proceeds, the Court may be faced with overturning the will of the voters of Ouachita Parish. This is the lesser intrusion on the sovereignty of the State.

### *III. CONCLUSION*

Plaintiffs have carried their burden of persuasion by showing that (1) there is a substantial likelihood that they will prevail on the merits, (2) they will suffer irreparable harm if a preliminary injunction is not granted, (3) the threatened injury to them outweighs the threatened harm the injunction may do to Defendants, and (4) granting the preliminary injunction will not disserve the public interest. Accordingly, Plaintiffs' request for preliminary injunctive relief is

hereby GRANTED.

MONROE, LOUISIANA, this 20 day of August, 2002.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

COPY SENT:
DATE: 8-20-02
BY:
TO: Jones
Noah
Bertrand  Faxed
Hodge
Norton

10